**ORIGINAL**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
SEP 21 2011
CLERK, U.S. DISTRICT COURT
By _____ Deputy

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | CRIMINAL COMPLAINT |
| v. | § § § | |
| | § | CASE NO. 4:11-MJ- 331 |
| KENNETH MARSHALL HOLCOMB (1) a/k/a "Kenny" CHRISTOPHER RAY KINSEY (2) a/k/a "Bandido Skinny" ERIN MYSHEA HARTZELL-KINSEY (3) a/k/a "Erin" and a/k/a "Shay" (phonetic) ALEXANDER JAMES BAKER (4) a/k/a "Alex" | § § § § § § § § § | |

## CRIMINAL COMPLAINT

I, J. Ray Harrison, hereinafter Complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

On or about June 1, 2009, and continuing until the date of this complaint, in the Northern District of Texas and elsewhere, **Kenneth Marshal Holcomb**, also known as Kenny, **Christopher Ray Kinsey**, also known as Bandido Skinny, **Erin Myshea Hartzell-Kinsey**, also known as Erin and Shay (phonetic), and **Alexander James Baker**, also known as Alex, did knowingly and intentionally combine, conspire, confederate and agree together and with each other, and with other persons known and unknown, to possess with intent to distribute 50 grams or more of methamphetamine, a Schedule II, Controlled Substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A),

All in violation of 21 U.S.C. §846.

Holcomb Complaint- Page 1

1. Complainant is a Special Agent of the Federal Bureau of Investigation (FBI). I have been so employed for approximately seven (7) years and am currently assigned to the Dallas Field Division's Fort Worth Resident Agency on a Criminal Enterprise Squad working with a Violent Crime/Gang Task Force (hereafter referred to as "the Task Force"). The Task Force is comprised of agents, investigators, and police officers from the FBI, the Drug Enforcement Administration (DEA), the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), the Arlington, Texas Police Department (APD), the Texas Department of Public Safety (TXDPS) and the Fort Worth, Texas Police Department (FWPD).

Prior to my employment with the FBI, I was employed for approximately five (5) years with the Clinton Police Department in Clinton, Mississippi. During my service as a law enforcement officer, I have participated in multiple investigations involving the unlawful distribution of illicit drugs. I have conducted or participated in physical and electronic surveillance, undercover transactions, the execution of search warrants and the debriefing of informants. Through my training, education, and experience, I have become familiar with the manner in which illicit drugs are transported, stored, and distributed and the methods of payment for such drugs. I am also familiar with the methods by which drug traffickers communicate and many of the code words commonly used by drug traffickers.

2. The statements contained in this Complaint are based, in part, on Undercover Agents, my personal observations, and on information provided by other Special Agents of the FBI, ATF, and DEA, and officers of APD, TXDPS, and FWPD, as well as by other law enforcement agencies identified below. Statements herein are also based on information provided by cooperating sources and cooperating defendants, all of whom are believed by me to be reliable and credible. Statements in this Complaint are further based on your **Complainant's** review of telephone toll records and pen registers, physical surveillance, police reports, and on my experience and training.

3. During the past several years, the FBI, along with other law enforcement agencies, have conducted a criminal investigation concerning the **Bandido Outlaw Motorcycle Gang (BOMG)** and other motorcycle gangs affiliated with the **BOMG**, referred to as "support clubs." For purposes of this Complaint, these criminal associates will be referred to as **BOMG**, collectively. Specifically, this investigation has targeted the illegal conspiracy by these organizations to possess, with the intent to distribute, illicit drugs and weapons.

4. In late 2009, an **FBI Undercover Employee (UCE-1)** was introduced to members of the **BOMG** and their **BOMG** affiliates. Following this introduction, **UCE-1**

was able to finance a motorcycle repair shop (hereafter referred to as "the shop"). The shop was used as an evidence and intelligence collection gathering platform against predicated members of the **BOMG**. After the shop was opened, **UCE-1** was able to form a criminal relationship with a patched **BOMG** member who agreed to supply **UCE-1** large quantities of methamphetamine for redistribution in order to further fund the shop. After several sales of methamphetamine to **UCE-1**, the **BOMG** member expressed a desire to speak to federal authorities regarding his criminal activity, as well as a desire to leave the **BOMG**. The subject confided to **UCE-1** that he was willing to work with federal authorities in exchange for consideration by the government in showing him some form of leniency for his past criminal acts. Following that conversation, **UCE-1** was able to facilitate a meeting between the subject and your **Complainant** on or about July 1, 2010. At that meeting, the subject agreed to work for the FBI as a **Cooperating Defendant** (hereafter referred to as **CD-1**). For clarity, the subject will be referred to as **CD-1** throughout the document, even though he did not agree to work for the FBI until July 1, 2010.

5.   On April 11, 2010, **CD-1** contacted **UCE-1** to discuss a pending methamphetamine purchase. At that time, **CD-1** was supplying **UCE-1** with methamphetamine that he was obtaining from a separate source of supply. During the conversation, **CD-1** indicated that he might have a new drug "connection" that might be able to supply methamphetamine at a lower price than the other source of supply. This second source of supply was later identified as **Christopher Ray Kinsey**, also known as **Bandido Skinny (Kinsey)**.

6.   On April 14, 2010, **CD-1** arrived at the shop in order to complete a methamphetamine purchase from his other source of supply. During the conversation with **UCE-1**, **CD-1** again referenced the second source of supply of methamphetamine (**Kinsey**). Prior to departing the shop at approximately 9:20 a.m., **CD-1** contacted the second source of supply via cellular telephone. **CD-1** either spoke directly with or left the drug supply source a voice-mail, which **UCE-1** overheard. **UCE-1** overheard **CD-1** order "two girls," which was coded language for two ounces of methamphetamine from the second source of supply. Telephone records indicate that **CD-1** contacted a cellular telephone utilized by **Kinsey**, at approximately 9:25 a.m. on April 14, 2010.

7.   On April 19, 2010, **UCE-1** contacted **CD-1** via cellular telephone to discuss the shop. During the conversation, **CD-1** stated that he would be willing to purchase more drugs on behalf of **UCE-1** in order to help keep the shop operational. **CD-1** also said that the second source of supply would be ready to deliver the methamphetamine to him between 5:30 and 6:00 p.m. on April 20, 2010.

On April 20, 2010, at approximately 5:00 p.m., **UCE-1** arrived at the shop in order to purchase two (2) ounces of methamphetamine. **UCE-1** provided **CD-1** with $3,400.00 in FBI drug purchase funds in order to pay for the methamphetamine. After obtaining the money, **CD-1** departed the shop. Surveillance units attempted to follow **CD-1** during the transaction but lost sight of him near I-820 and 199 (Jacksboro Highway).

At approximately 6:45 p.m. that same day, **CD-1** delivered approximately two (2) ounces of methamphetamine to **UCE-1** at the shop.

DEA testing confirmed that the substance was methamphetamine with a net weight of 53.5 grams with a 99.6 percent purity.

Telephone analysis confirmed that there was cellular telephone contact between **CD-1** and **Kinsey** during the transaction. Additionally, there was cellular telephone contact between **Kinsey** and a cellular telephone subscribed to **Kenneth Holcomb** [**Kenneth Marshal Holcomb** also known as **Kenny (Holcomb)**] during the transaction.

8. On May 5, 2010, at approximately 4:30 p.m. **UCE-1** met **CD-1** at the shop in order to purchase approximately two (2) ounces of methamphetamine. After **UCE-1** arrived at the shop, he provided **CD-1** with $3,400.00 in FBI drug purchase money in order to complete the purchase of methamphetamine. At approximately 5:38 p.m., **CD-1** departed the shop to go meet with **Kinsey**.

At approximately 6:14 p.m., **CD-1** arrived at the House of Blades, located in Fort Worth, Texas. Surveillance units observed **CD-1** talking on his cellular telephone. Approximately one minute later, **CD-1** got onto his motorcycle and drove across Loop 820 to Buffalo Wild Wings, located in Fort Worth, Texas. **CD-1** parked his motorcycle and walked into the restaurant. While inside, surveillance units observed **CD-1** meet with **Kinsey**.

At approximately 6:32 p.m., **Kinsey** got up from the table to exit the restaurant, while **CD-1** remained seated. Surveillance units observed **Kinsey** place his hands in his front pocket as he walked away. **Kinsey** left the restaurant in a black 2008 Chevrolet pickup. **Kinsey** drove to the Kohl's department store, located in Lake Worth, Texas. At approximately 6:39 p.m., **Kinsey** picked up a female child, later identified as his three-year-old daughter, and an adult female, later identified as his spouse, **Erin Myshea Hartzell-Kinsey,** also known as Erin, and Shay [phonetic] (**Erin Kinsey**).

**Kinsey** was observed driving the above mentioned pickup with **Erin Kinsey** and the child as passengers. **Kinsey** drove them to a McDonald's restaurant, located in Fort Worth, Texas. The three arrived at approximately 7:18 p.m. At approximately the same time, a 2007 Silver Mitsubishi passenger vehicle arrived and parked in the parking lot (this vehicle was later identified as a vehicle used by **Holcomb**.) The Mitsubishi was occupied by **Holcomb**. **Kinsey** exited his pickup and walked over to **Holcomb's** vehicle. Surveillance units observed **Holcomb** hand **Kinsey** an item.

After the transaction, **Kinsey** walked away from the silver Mitsubishi carrying the item he received from **Holcomb**. **Kinsey** got back into his vehicle and drove across the street to Joe's Crab Shack, located in Fort Worth, Texas. **Holcomb** remained parked at the McDonald's restaurant. Surveillance units observed **CD-1** outside Joe's Crab Shack at approximately 7:21 p.m. Upon **Kinsey's** arrival, **CD-1** walked back into Joe's Crab Shack. Surveillance units observed **CD-1** sitting with **Kinsey, Erin Kinsey,** and their daughter inside the restaurant.

[**CD-1**, after becoming a cooperating defendant on July 1, 2010, stated during a debrief that on this particular occasion **Erin Kinsey** had handed **Kinsey** the methamphetamine, then **Kinsey** handed the methamphetamine directly to **CD-1**. The couple's three-year-old daughter was present during this methamphetamine purchase and on two other purchases made by **CD-1**. **Erin Kinsey** was present for this transaction and two other drug transactions.]

**CD-1** left Joe's Crab Shack a short time later and arrived at the shop at approximately 7:46 p.m. **CD-1** removed a package containing the methamphetamine from his riding glove and provided it to **UCE-1**. **UCE-1** indicated that the methamphetamine was in a clear plastic bag and was wrapped in a candy sack.

DEA testing confirmed that the substance provided to **UCE-1** was methamphetamine with a net weight of 53.9 grams with a 97.5 percent purity.

Telephone analysis confirmed that there was cellular telephone contact between **CD-1** and **Kinsey** during the transaction. Additionally, there was cellular telephone contact between **Kinsey** and the phone used by **Holcomb** during the transaction.

9. <u>Identification of **Holcomb**</u>

Based on the May 5, 2010, controlled purchase of methamphetamine, an investigation was conducted in order to positively identify **Kinsey's** source of supply.

Based on telephone analysis, it was determined that between the hours of 1:20 p.m. and 7:33 p.m., **Kinsey's** cellular telephone was in contact with telephone number 817-897-8340 on nine separate occasions. Open source records indicate that the telephone is subscribed to **Holcomb.**

A criminal history records check revealed **Holcomb** was convicted for a felony drug-related offense and was on parole for that offense during the transaction on May 5, 2010. Texas Department of Criminal Justice (TDCJ) records revealed that **Holcomb** resided at 2921 Vistas Drive #222, Fort Worth, Texas and that he had listed his cellular telephone number as 817-897-8340.

10. On June 3, 2010, investigators attempted to conduct a controlled purchase of two (2) ounces of methamphetamine from **CD-1**, **Kinsey**, and **Holcomb**. During a series of texts messages and conversations, **CD-1** informed **UCE-1** that **Kinsey** was on a protection detail of the Fort Worth **BOMG** President and would not be able to get the methamphetamine until after 9:00 p.m. The pair agreed to conduct the purchase the following day due to **Kinsey's** unavailability.

On June 4, 2010, at approximately 9:32 a.m., surveillance was initiated on **Holcomb's** residence (cited above). Surveillance units observed a 2007 silver Mitsubishi Avenger parked in the parking lot (this vehicle was observed on a previous drug purchase and was driven by **Holcomb**). A silver 2003 four-door Chevrolet 3/4 ton pickup was parked beside the Mitsubishi. Both vehicles faced east toward **Holcomb's** apartment.

At approximately 10:20 a.m., **Holcomb** exited his apartment and walked to the Chevrolet pickup. **Holcomb** retrieved a sword from the backseat of the vehicle, then went back inside the apartment. At approximately 10:24 a.m., **Holcomb** walked back to the Chevrolet pickup. Surveillance observed that **Holcomb** was talking on a cellular telephone. **Holcomb** left the apartment complex driving the pickup and traveled to the House of Blades.

At approximately 10:35 a.m., **UCE-1** met with **CD-1** at the shop. **UCE-1** provided **CD-1** with $3,400.00 in FBI drug purchase funds in order to purchase approximately two (2) ounces of methamphetamine. **CD-1** departed the shop to meet with **Kinsey** to obtain the methamphetamine.

Surveillance units followed **CD-1** from the shop to a What-a-Burger restaurant, located at Blue Mound Road and Loop 820 North. **Kinsey** was observed sitting in a black Scion registered to **Erin Kinsey** that was parked in the parking lot of the restaurant at approximately 11:20 a.m. **CD-1** walked over and got into the passenger side

Holcomb Complaint- Page 6

of **Kinsey's** vehicle. At approximately 11:30 a.m., **CD-1** exited **Kinsey's** vehicle, walked back to his own vehicle, drove out of the parking lot, then parked in the McDonald's parking lot across the street.

**Kinsey** entered the McDonald's restaurant twice, and at 12:04 p.m., the Chevrolet pickup driven by **Holcomb** arrived and parked beside **Kinsey's** vehicle. **Kinsey** got into the passenger side of **Holcomb's** vehicle. At approximately 12:10 p.m., **Kinsey** exited the vehicle and got back into his Scion, then drove across the street to meet with **CD-1** in the McDonald's parking lot.

**Kinsey** left the McDonald's parking lot at approximately 12:15 p.m. and was followed by surveillance units to his residence, located in Springtown, Texas.

**CD-1** was followed back to the shop by surveillance where he delivered approximately two ounces of methamphetamine to **UCE-1** at approximately 12:45 p.m.

The Chevrolet pickup driven by **Holcomb** arrived back at his residence at approximately 12:48 p.m.

DEA testing confirmed that the substance provided to **UCE-1** was methamphetamine with a net weight of 55.7 grams with a 93.7 percent purity.

Telephone analysis confirmed that there was cellular telephone contact between **CD-1** and **Kinsey** during the transaction. Additionally, there was cellular telephone contact between **Kinsey** and **Holcomb** during the transaction.

11. On June 23, 2010, **CD-1** met with **UCE-1** at the shop to discuss a pending methamphetamine transaction scheduled for later that day. **CD-1** informed **UCE-1** that **Kinsey** was "up north" somewhere and did not even know his own whereabouts due to his excessive drug usage. **CD-1** stated that **Kinsey** wanted to transact the deal the following day at approximately 9:30 a.m.

On June 24, 2010, at approximately 7:30 a.m., surveillance units located **Holcomb** sitting in the driver seat of the four-door Chevrolet pickup mentioned above, which was parked outside his residence. **Holcomb** was sitting alone. At approximately 8:15 a.m., surveillance units observed that the vehicle had left the apartment complex.

At approximately 9:31 a.m., **CD-1** met with **UCE-1** at the shop in order to conduct a purchase of methamphetamine. **UCE-1** provided **CD-1** with $3,400.00 in FBI drug purchase funds in order to purchase two (2) ounces of methamphetamine.

Holcomb Complaint- Page 7

At approximately 9:45 a.m., surveillance located **Holcomb's** Chevrolet pickup and a silver Mitsubishi car parked at the Fairfield Inn, located in Fort Worth, Texas. Both vehicles were unoccupied. At approximately 9:56 a.m., surveillance observed **Holcomb** outside the pickup, talking on a cellular telephone. At this approximate time, there were several telephone contacts between **Kinsey's** cellular telephone and **Holcomb's** cellular telephone.

At 10:15 a.m., **CD-1** left the shop in order to travel to purchase two (2) ounces of methamphetamine for **UCE-1**. At approximately 10:37 a.m., **CD-1** arrived at the What-a-Burger restaurant, located in Fort Worth, Texas. At approximately 10:44 a.m., **Kinsey, Erin Kinsey,** and their small child arrived in the previously mentioned black Scion. **Erin Kinsey** was observed driving the vehicle into the restaurant parking lot. **Erin Kinsey** parked beside **CD-1's** vehicle, then removed the child from a car seat and went inside the restaurant. **Kinsey** got into the vehicle with **CD-1**.

At approximately 10:46 a.m., **Kinsey** got out of **CD-1's** vehicle and returned back into the Scion (front passenger side). **CD-1** left the parking lot traveling east on Blue Mound Road. **Erin Kinsey** returned to the Scion with the child, placed her back into her child seat, then got into the front driver seat. All three remained in the parked car.

**Holcomb** left the hotel at approximately 10:54 a.m. and drove directly to the What-A-Burger in the Chevrolet pickup, arriving at approximately 11:01 a.m. At approximately the same time, **CD-1** was observed pulling into the McDonald's restaurant, just east of the What-A-Burger. **Holcomb** parked beside **Kinsey's** Scion. **Kinsey** got out of his vehicle and spoke to **Holcomb** at **Holcomb's** driver side window briefly, then **Kinsey** returned to the passenger side of the Scion.

At approximately 11:07 a.m., **Erin Kinsey** drove the Scion out of the What-A-Burger parking lot and into the McDonald's parking lot, where she parked beside **CD-1**. At that time, all surveillance units followed **Holcomb.**

**CD-1** delivered approximately two (2) ounces of methamphetamine to **UCE-1** at approximately 11:45 a.m.

DEA testing confirmed that the substance provided to **UCE-1** was methamphetamine with a net weight of 53.9 grams with a 88.9 percent purity.

Telephone analysis confirmed that there was cellular telephone contact between **CD-1** and **Kinsey** during the transaction. Additionally, there was cellular telephone contact between **Kinsey** and **Holcomb** during the transaction.

Continued Surveillance of **Holcomb**

**Holcomb** exited the What-A-Burger parking lot and traveled to a Jack-In-The-Box restaurant, located at White Settlement Road and Loop 820. **Holcomb** parked his vehicle in the parking lot at approximately 11:25 a.m. At approximately 11:30 a.m., a maroon 1987 BMW arrived. A white female exited the BMW and approached the driver side of **Holcomb's** vehicle. **Holcomb** handed the female a brown paper bag and the female returned to her BMW.

At approximately 11:36 a.m., **Holcomb** exited the parking lot and drove to the parking lot of Academy Sports, located at Bryant Street and Loop 820. **Holcomb** arrived at approximately 11:47 a.m. and met with a white male, later identified as **Alexander James Baker,** also known as **Alex (Baker)**. **Baker** got into the passenger side of **Holcomb's** vehicle. At approximately 11:54 a.m., **Baker** exited the vehicle and returned to his vehicle, a gray 2000 Hyundai.

**Holcomb** was followed to the Marine Creek Apartments, located in Fort Worth, Texas. Surveillance was terminated on **Holcomb** at approximately 12:40 p.m.

Following the meeting with **Holcomb, Baker** was stopped by the Fort Worth Police Department. **Baker** was found to be in possession of approximately 1/4 ounce of suspected methamphetamine. **Baker** agreed to cooperate with law enforcement. **Baker** advised that he had just purchased the 1/4 ounce of methamphetamine from **Holcomb** for $375.00.

During interviews with **Baker** on June 24 and June 27, 2010, **Baker** provided the following information regarding his drug distribution. **Baker** indicated that he had been selling methamphetamine for approximately eight months to one year. **Holcomb** began to supply **Baker** with high quality methamphetamine in January of 2010. Initially and for approximately one month, **Baker** would purchase two (2) grams of methamphetamine every other day. **Baker** would use a portion, then resell the remaining portion. **Baker** admitted he had seven to eight regular customers. After approximately one month, **Baker** began purchasing 1/4 ounce (seven grams) every other day. Another month later, **Baker** began to purchase 1/4 ounce every day. In addition to that, **Baker** would purchase ½ ounce (14 grams) approximately two times per week. **Baker** stated the

smallest amount he would get per day was 1/4 ounce. **Baker** indicated that **Holcomb** charged $375.00 for 1/4 ounce; $725.00 for ½ ounce; and between $1,400.00 and $1,500.00 for one (1) ounce.

**Holcomb** gave **Baker** methamphetamine in advance of payment with the understanding that **Baker** would pay **Holcomb** later. After obtaining the methamphetamine, **Baker** would sell it to his own customers, then repay **Holcomb** for the methamphetamine before obtaining more to use and to sell. Typically, **Holcomb** would meet **Baker** in different locations, but **Baker** had also been to **Holcomb's** residence on approximately ten (10) occasions, which **Baker** knew to be the Lake Worth Villa Apartments, located off of Quebec Street in apartment number 222. On approximately six (6) of those occasions, **Baker** went inside the apartment to obtain the methamphetamine. **Holcomb** had a live-in wife or girlfriend, but **Baker** did not know if she knew that Holcomb was selling drugs. **Baker** also had cellular telephone number 817-897-8340 listed under "Kenny" in his personal telephone (known cellular telephone number for **Holcomb**).

During methamphetamine sales, **Holcomb** initially drove a silver Mitsubishi SUV that **Baker** described as **Holcomb's** girlfriend or wife's vehicle. **Holcomb** was also observed driving a silver Chevrolet pickup that **Holcomb** told **Baker** he had purchased from a friend.

12. On July 8, 2010, **CD-1** met with **UCE-1**. **UCE-1** provided **CD-1** with $3,500.00 in FBI drug purchase funds in order to purchase two (2) ounces of methamphetamine and one (1) gram of heroin from **Kinsey**, as previously arranged with **Kinsey** by **CD-1**. [The present purchase was the first purchase of methamphetamine from **Kinsey** wherein **CD-1** was directed by the FBI. In the drug purchase transactions detailed above, **CD-1** was *not* working at the direction of the FBI.]

At approximately 12:00 noon, **CD-1** received a call from **Kinsey**. During the conversation, **Kinsey** told **CD-1** to meet him at the What-A-Burger restaurant, located in Fort Worth, Texas. Surveillance units observed **CD-1** arrive at the Mustang Inn and Suites, located in Fort Worth, Texas. **Kinsey** was accompanied by **Erin Kinsey** and their female child. **Kinsey** got out of his black Scion, retrieved something from inside the vehicle, then walked over to **CD-1's** vehicle. The two spoke briefly then departed. **CD-1** later delivered **UCE-1** approximately three (3) ounces of methamphetamine and no heroin. **CD-1** informed **UCE-1** that he had given **Kinsey** the money he had gotten from him earlier for the two (2) ounces, but because **Kinsey** had gotten confused and provided three (3) ounces, **UCE-1** would have to pay **Kinsey** for the third ounce ($1,550.00). **UCE-1** then provided **CD-1** money to pay for the third ounce.


Following the meeting with **CD-1**, surveillance units followed **Kinsey** after the transaction. After providing the methamphetamine to **CD-1**, **Kinsey** departed the hotel parking lot and traveled directly to a known drug distribution house located in Fort Worth, Texas. **Kinsey** parked his Scion on the street in front of the residence. As he was parking, a silver 2006 Chrysler 300 pulled into the driveway. An unknown female exited the Chrysler with a small child and began speaking to the **Kinseys**. **Kinsey**, **Erin Kinsey**, and their child exited the Scion, spoke briefly to the unknown female in the yard and then everyone went inside the aforementioned residence.

At approximately 12:13 p.m., all three **Kinseys** were observed back in the black Scion. The vehicle was then followed to the shop. **Kinsey** parked the vehicle and went inside. **Erin Kinsey** and their child remained in the vehicle. Once inside, **CD-1** paid **Kinsey** the money for the third ounce of methamphetamine.

After obtaining the money for the third ounce of methamphetamine from **CD-1**, **Kinsey** stopped briefly at a Sonic restaurant, located in Fort Worth, Texas, then returned to the aforementioned known drug distribution house located in Fort Worth, Texas. The black Scion remained at the residence approximately three minutes, then departed.

DEA testing confirmed that the substance provided to **UCE-1** was methamphetamine with a net weight of 82.2 grams with a 68.1 percent purity.


Based on the foregoing, the Complainant believes that probable cause exists that **Kenneth Marshal Holcomb,** also known as Kenny, **Christopher Ray Kinsey**, also known as Bandido Skinny, **Erin Myshea Hartzell-Kinsey**, also known as Erin and Shay (phonetic), and **Alexander James Baker**, also known as Alex have committed offenses involving violations of Title 21, United States Code, Section 841(a)(1)(Possession of a Controlled Substance with the Intent to Distribute); United States Code, Section 846 (Conspiracy to Possess with Intent to Distribute a Controlled Substance); and Title 18, United States Code, Section 2 (Aiding and Abetting the above-described offenses).

_____
J. Ray Harrison, Special Agent,
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence, September 21, 2011, at Fort Worth, Texas, at 4:27 o'clock, p.m.

_____
HONORABLE JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE